UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

_____
                                                    )
DARLENE TRIPP AS ADMINISTRATOR OF                   )
THE ESTATE OF GLORIA J. MICHAUD                     )
        Plaintiff                                   )
                                                    )
            vs.                                     )          Case No.:_____
                                                    )          Jury Trial Demanded
                                                    )
WOODBINE SENIOR LIVING, LLC.                        )
                                                    )
_____)

## COMPLAINT & DEMAND FOR JURY TRIAL

1.      Plaintiff DARLENE TRIPP AS ADMINISTRATOR OF THE ESTATE OF

GLORIA J. MICHAUD files the instant complaint against Defendant WOODBINE

SENIOR LIVING, LLC., and states as follows, while demanding a jury trial.

## PARTIES, JURISDICTION, AND VENUE

2.      Plaintiff, DARLENE TRIPP, duly appointed as administrator of the ESTATE OF

GLORIA J. MICHAUD, previously resided at 45 Knox Marsh Road, Dover, NH 03820

during the incidents at issue, and currently resides at 16 Riverside Farm Drive, Lee, NH

03861.

3.      Defendant WOODBINE SENIOR LIVING, LLC. is a corporation organized and

existing under the laws of the State of Maryland, with its principal place of business in

Tampa, FL.  At all relevant times, Defendant WOODBINE SENIOR LIVING, LLC was

the owner, operator, and manager of Spring Village at Dover, a "Supported Residential

Care Facility" located at 35 Pointe Pl, Dover, NH 03820.

1

4.       This Court has personal jurisdiction over Defendant WOODBINE SENIOR

LIVING, LLC., which conducts business in New Hampshire through its actions and

through the joint actions of its subsidiary companies and agents, *including but not limited*

*to*, the Spring Village at Dover facility at issue in this Complaint. Defendant WOODBINE

SENIOR LIVING, LLC. derives significant revenue from its activities in this state.

Defendant WOODBINE SENIOR LIVING, LLC. reasonably anticipates being hailed into

a New Hampshire court and has consented to the jurisdiction of this Court.

5.       Federal diversity in this Court is proper under 28 U.S.C. § 1332 because Plaintiff

is a citizen of New Hampshire, a different state than Defendants' place of incorporation

and headquarters, and the aggregate amount in controversy exceeds $75,000, exclusive of

interest and costs.

6.       Venue is proper within this District because the events giving rise to this action

happened in or are closely related to this District.

## JURY TRIAL DEMANDED

7.       Plaintiff demands a trial by jury on each of the causes of action pleaded herein.


## FACTS AND ALLEGATIONS

8.       On December 31, 2019, the State of Vermont and WOODBINE SENIOR

LIVING, LLC entered into a settlement agreement in which WOODBINE SENIOR

LIVING, LLC agreed to pay a $120,000 fine and to never operate in Vermont again.

9.       Spring Village at Essex, a 56 bed "memory care" community in Essex Junction,

VT, was operated by WOODBINE SENIOR LIVING, LLC.  The facility was accused of

violating Vermont's Consumer Protection Act by misrepresenting to families of

prospective residents, via its marketing materials and conversations, that it would be able

to care for their loved one at all stages of dementia and aging, regardless of the level of care that they needed.

10.     The false and deceptive representations at issue – which WOODBINE SENIOR LIVING, LLC was responsible for - included identifying Spring Village at Essex as "an Assisted Living community specializing in care for people with Alzheimer's, Dementia, and Memory Loss;" that it was "for those who need a high level of care;" and that it provided for "aging in place, including end of life care."

11.     Spring Village at Essex made similar oral representations to many prospective residents' families.

12.     However, Spring Village at Essex could not have possibly followed through with its marketing representations because it was only licensed as a "residential care home." Per Vermont's state regulations, residential care homes like Spring Village at Exeter cannot provide care for residents who need full-time nursing care.  They are even required to discharge residents when it becomes apparent that they require a higher level of care.

13.     Ultimately, Spring Village at Essex ended up having to issue several notices of discharges to residents who need a higher level of care. Several of these families filed complaints with the state Ombudsman's office alleging that they had been promised care through end of life, prompting the state into action.

14.     "In lieu of instituting an action or proceeding against Woodbine, the Attorney General and Woodbine" entered an Assurance of Discontinuance on December 31, 2019, which Plaintiff fully incorporates herein by reference.

15.     On March 13, 2020, just three months after being banned from operating in the State of Vermont, WOODBINE SENIOR LIVING, LLC began operating in the State of New Hampshire for the first time through a new facility called Spring Village at Dover.

16.    WOODBINE SENIOR LIVING, LLC chose to apply for and become licensed as a "Supported Residential Care Facility."

17.    New Hampshire regulations for "Supported Residential Care Facilities" are similar to the Vermont regulations cited above for "residential care homes" in that they both place limits on type of care that can be provided (less than a nursing home), and they are both required to discharge and/or transfer residents who require a higher level of care than they can offer.

18.    New Hampshire's RSA 151:9, VII. (a)(2) defines "Supported Residential Health Care" as "reflecting the availability of social or health services, as needed, from appropriately trained or licensed individuals, who need not be employees of the facility, but shall not require nursing services complex enough to require 24-hour nursing supervision. Such facilities may also include short-term medical care for residents of the facility who may be convalescing from an illness and these residents shall be capable of self-evacuation."

19.    New Hampshire's regulations for "Supported Residential Health Care" facilities are laxer and vaguer than those for nursing homes (e.g., required to have a "**sufficient** number of staff."). *See* He-P 805. In addition, such facilities do not need to become certified (or tracked) by the Centers of Medicaid Services (CMS) and can choose to only take private pay.

20.    Conversely, "Nursing Homes" provide a higher level of care and are defined as "providing a range of social and health services, including 24-hour-a-day supervision and the provision of medical care and treatment, according to a plan of care, by appropriately trained or licensed individuals who are employees of or who are under contract to the facility."

21.     New Hampshire's regulations for "Nursing Homes" are much more detailed and demanding than those for "Supported Residential Health Care Facilities" (e.g., "Services of a licensed nurse required 24 hours a day; Services of RN required at least 8 hours within a 24-hour period.").  In addition, Nursing Homes are required to be certified (and tracked) by the CMS.

22.     New Hampshire has several different statutes that require a residential care facility like Spring Village at Dover to discharge and/or transfer a resident when they cannot meet their needs, either on account of the license issued to the facility or a lack of adequate resources.  *See* RSA 151:5-a; RSA 151:19; RSA 151:21 V; and RSA 151:26.

23.     WOODBINE SENIOR LIVING, LLC immediately began marketing Spring Village at Dover in a manner nearly identical to how it had improperly marketed Spring Village at Essex in Vermont.

24.     On March 17, 2020, four days after becoming licensed as a Supported Residential Health Care Facility, WOODBINE SENIOR LIVING, LLC issued a press release for Spring Village at Dover that stated in part:

- "In most circumstances, residents are able to stay in their familiar suite with their familiar care partners **right through end of life**."

- "Specializing in memory care."

- "Our staff are highly trained to assist our residents that do have a dementia diagnosis."

25.     The two main buckets of marketing misrepresentations that WOODBINE SENIOR LIVING, LLC made for Spring Village at Dover and that are at issue here are those relating to: 1) care "right through end of life"; and 2) specialized "memory care."

26.     It is not by accident that WOODBINE SENIOR LIVING, LLC continued to make these two representations their top two selling points, even after getting kicked out of the State of Vermont.  WOODBINE SENIOR LIVING, LLC knows through market surveys and other efforts that these are two uniquely important considerations for their "potential customers."

27.     WOODBINE SENIOR LIVING, LLC – through not just Spring Village at Dover, but its various facilities – made these marketing representations knowing that it cannot possibly follow through with these promises.  This in part because: 1) its chosen license status prohibits it from providing care "right through end of life"; and 2) it chooses not to dedicate any meaningful effort or resources towards providing any type of specialized "memory care," rendering it a hollow and misleading marketing representation.

28.     By the fall of 2020, Ms. Gloria Michaud had been suffering from recurrent falls at her home, where she still lived.  Ms. Michaud suffered from dementia, and her two daughters -Darlene Tripp and Doreen Leighton- feared for her safety and wellbeing. After careful thought and consideration, Ms. Michaud's daughters began looking for a care facility to help take care of their mother and ensure her safety.  Ms. Michaud's daughters took this process so seriously that they even enlisted the assistance of a third party – Oasis Senior Advisors – to help identify the best fit for their mom.

29.     During the search process, Ms. Michaud's daughters reviewed the website of Spring Village at Dover.  Some of the specific marketing representations available on their website at that time that the daughters reviewed and relied upon include:

-   "Wherever you are on the Memory Care path, let us take the journey with you" – this was the featured statement on the home page, in large font.

- "We offer a safe option for people who wish to live independently with minimal assistance, and for those who need a high level of care."

- "We are able to meet our resident's needs wherever they are on their journey."

- "Specializing in Memory Care."

- "Our dementia care professionals provide safe and secure 24-hour support."

- "The Present Moment Program is a specialized lifestyle and leisure program based on current best dementia care practices proven to generate such positive outcomes as prolonging a person's existing abilities and slowing the progressing of the symptoms of dementia.  The program is overseen by a Certified Dementia Care Practitioner and every Spring Village at Dover team member who cares for your loved-one has specialized dementia training to ensure that your residents are living their personalized best quality of life in every moment."

30.     Darlene Tripp, Ms. Michaud's DPOA, also conducted various Google searches and reviewed and relied upon the above press release.

31.     Spring Village at Dover staff similarly made oral representations to both of Ms. Michaud's daughters that, if they moved their mom to Spring Village at Dover, she would be able to "age in place" and receive "end of life care," thus never having to move again; and, further, that they could expect specialized "memory care" from specially trained dementia care staff.

32.     Ms. Michaud's daughters relied on the written and oral representations described above in deciding to admit their mom to Spring Village at Dover.

33.     Ms. Michaud was first scheduled to be admitted to Spring Village at Dover on October 27, 2020.  However, on October 26, 2020, she was admitted to Wentworth-

Douglass Hospital after a fall.  The records state in part:  "For the past week, patient has been having frequent falls…being admitted for recurrent falls…"

34.     On October 30, 2020, Ms. Michaud was admitted to Spring Village at Dover.  Her records upon admission, and throughout her stay, clearly indicate that she is "an extremely high fall risk."

35.     Ms. Michaud suffered numerous falls throughout her stay, several of which caused serious injury.  Throughout these incidents, Ms. Michaud's daughters expressly asked if this was the right level of care and questioned whether they needed to move their mom to a nursing home.  They were assured that Spring Village at Dover could keep people through all of the stages up to death and that no higher standard of care was required.

36.     On November 1, 2020, Ms. Michaud was found on the floor next to her bed.

37.     On November 3, 2020, Ms. Michaud was again found on the floor next to her bed. The next day a patient evaluation was ordered.

38.      On November 6, 2020, Ms. Michaud was again found on the floor next to her bed.

39.     On November 9, 2020, the patient evaluation noted that "she is an extremely high fall risk."

40.     On November 11, 2020, there is a note about removing staples from her scalp with no reference to sending her to an emergency department.  There is also reference to an unwitnessed fall.

41.     On November 12, 2020, Ms. Michaud was again found on the floor next to her bed.

42.     On November 17, 2020, Ms. Michaud was twice found on the floor next to her bed.  In between falls she was given a call pendant.

8

43.     On November 19, 2020, Ms. Michaud was again found on the floor next to her bed.  The chosen intervention was "education on pendant & use of walker."

44.     On November 21, 2020, Ms. Michaud suffered an unwitnessed fall.

45.     On November 21, 2020, Ms. Michaud was against found on the floor next to her bed.

46.     On November 22, 2020, Ms. Michaud was found on the floor between the bed and window.

47.     On November 23, 2020, Ms. Michaud was again found on the floor next to her bed.

48.     On November 24, 2020, Ms. Michaud fell during a safety check.

49.     On November 27, 2020, Ms. Michaud was again found on the floor next to her bed.

50.     On December 3, 2020, Ms. Michaud fell while attempting to stand up.

51.     On December 12, 2020, Ms. Michaud fell in the dining room at breakfast and hit her head.  She was sent to the ED.

52.     On December 15, 2020, physical therapy suggested additional therapy.

53.     On December 16, 2020, Ms. Michaud was again found on the floor next to her bed.

54.     On December 17, 2020, Ms. Michaud was again found on the floor next to her bed.

55.     On December 19, 2020, Ms. Michaud was again found on the floor next to her bed.

56.     On December 21, 2020, Ms. Michaud was again found on the floor next to her bed.  The chosen intervention was to remind this resident with dementia to use call pendant or wall alarm.

57.     On January 29, 2021, Ms. Michaud fell while trying to sit in her chair.

58.     On January 29, 2021, Ms. Michaud had another fall while attempting to use her walker.

59.     On February 2, 2021, Ms. Michaud was again found on the floor next to her bed.

60.     On February 12, 2021, Ms. Michaud fell and hit her head.

61.     On February 14, 2021, Ms. Michaud was "exit seeking" and wanting to leave the facility.

62.     On March 1, 2021, Ms. Michaud was again found on the floor next to her bed.

63.     On March 7, 2021, Ms. Michaud suffered a witnessed fall.

64.     On March 7, 2021, Ms. Michaud suffered a second witnessed fall.

65.     Up through this point, Ms. Michaud had suffered no less than 25 falls, several of which had caused injury and/or required treatment at the ED.  Defendant clearly should have transferred and/or discharged Ms. Michaud to a different facility to receive higher care and more supervision.

66.     In addition, contrary to Defendant's marketing representations about its specialized and individualized care that adapts to residents' needs, they made no meaningful effort to identify and address the underlying circumstances of Ms. Michaud's falls.  Had they done so, they would have realized that many of her falls occurred in her room and/or overnight.  Easily available solutions include increased supervision during night shifts and/or engaging her with activities.

67.     Instead, Defendant put profit over safety and chose to retain Ms. Michaud as a resident so that it could continue receiving $7,000 a month in private pay from the family. And Defendant did so in bad faith until its inactions finally caused her death.

68.     On March 19, 2021, Ms. Michaud was found after suffering a fall.  She was found to have bruising and swelling on her right eye, along with dried blood.  She had likely fallen hours before she was found.  There were indications of internal bleeding.  She should have been taken to the hospital, but instead she was put back in bed as had happened several times before.

69.     Approximately two hours later, Ms. Michaud suffered a second fall.  She again hit her head.  She was finally sent to the ED.

70.     Three days later, on March 22, 2021, Ms. Michaud was pronounced dead.  Her cause of death was listed as "subdural hematoma" and "blunt head injury."

71.     Ms. Michaud's death was easily avoidable had Defendant not ignored, for financial gain, the applicable standard of care and regulations.

72.     WOODBINE SENIOR LIVING, LLC controlled the operation, planning, management, and quality control of Spring Village at Dover.  This included, but was not limited to, control of marketing, overseeing day-to-day operations, including the provision of care, human resources management, training, staffing, creation and implementation of all policy and procedures used, and licensure and certification.

73.     It is and was WOODBINE SENIOR LIVING, LLC's corporate philosophy to place its own financial wellbeing over the needs of its residents.  The operational decisions that were made by WOODBINE SENIOR LIVING, LLC, as a result of that philosophy, are the proximate cause of the circumstances and events that led to Ms. Michaud's injuries and, eventually, her death.  This includes but is not limited to

admitting and retaining as many residents as possible due to a low census; deliberately failing to discharge residents who require a higher level of care; deliberately failing to provide its promise of specialized memory care; and deliberately causing staffing levels to become dangerously low.

74.     WOODBINE SENIOR LIVING, LLC owed a duty to Ms. Michaud to use their best efforts and to provide sufficient resources so that she could be adequately cared for. Before her admission to Spring Village at Dover, WOODBINE SENIOR LIVING, LLC knew that Ms. Michaud suffered from dementia, had a history of falls and remained at high risk for future falls, and was frail and dependent upon WOODBINE SENIOR LIVING, LLC to care for her needs.

75.     WOODBINE SENIOR LIVING, LLC was not adequately providing care for the residents of the various facilities it owned and operated, including but not limited to Spring Village at Dover.  WOODBINE SENIOR LIVING, LLC was aware of the complaints, concerns and problems at its facilities.  WOODBINE SENIOR LIVING, LLC ignored these complaints, concerns and problems and focused on maximizing their profits to the detriment of residents like Ms. Michaud.

76.     WOODBINE SENIOR LIVING, LLC was aware of Ms. Michaud's medical condition and the care and treatment she required when WOODBINE SENIOR LIVING, LLC represented that it could adequately care for her needs.  Notwithstanding this knowledge, WOODBINE SENIOR LIVING, LLC failed to provide for Ms. Michaud's needs and failed to provide sufficient staff, services, training, and supplies to meet the needs of Ms. Michaud.  WOODBINE SENIOR LIVING, LLC's resident care staff was understaffed, inexperienced, and/or inadequately trained, including but not limited to the very dementia care that it marketed as being special and unique.

77.     WOODBINE SENIOR LIVING, LLC failed to care for Ms. Michaud with a conscious disregard for her rights and safety.  At all times mentioned herein, WOODBINE SENIOR LIVING, LLC had knowledge of, ratified, or otherwise authorized all of the acts or omissions that caused the injuries suffered by Ms. Michaud. WOODBINE SENIOR LIVING, LLC knew that, due to its lack of adequate resources, it could not provide even the minimum standard of care to the vulnerable residents of the facility and as a result, Ms. Michaud died tragically and prematurely.

78.     At all times relevant herein, WOODBINE SENIOR LIVING, LLC operated and managed the facilities so as to maximize profits by reducing the resources to a level below that which was needed to provide care to the residents.  Specifically, WOODBINE SENIOR LIVING, LLC intentionally and with knowing and reckless disregard for the consequences of their actions caused staffing levels, supplies, and other necessary resources to be set at a level where the caregivers could not reasonably attend to the needs of the residents.  All of these acts of malfeasance directly caused injury to Ms. Michaud and were known to WOODBINE SENIOR LIVING, LLC.  The acts and omissions of WOODBINE SENIOR LIVING, LLC were motivated by a desire to increase the profitability and net worth of WOODBINE SENIOR LIVING, LLC.

**FIRST COUNT:  RECKLESSNESS/GROSS NEGLIGENCE**

79.     Plaintiff reiterates and incorporate herein the aforementioned allegations.

80.     Defendants and/or their employees, agents and/or representatives had a duty of care to ensure the safety and well-being of Ms. Michaud

81.     Notwithstanding said duties, Defendants, through their agents, servants and employees, grossly failed to timely and adequately provide adequate care and treatment to

Ms. Michaud and further grossly failed to discharge and/or transfer her before it was too late.

82.     As a direct, proximate, and foreseeable result of the Defendants' recklessness and/or gross negligence, Ms. Michaud died prematurely on March 22, 2021.

83.     As a direct, proximate and foreseeable result of the Defendants' recklessness and/or gross negligence, Ms. Michaud suffered losses and damages including but not limited to her untimely and wrongful death, loss of enjoyment of life, excruciating pain and suffering, loss of income, and loss of other economic benefits and damages.

84.     As a direct, proximate and foreseeable result of the Defendants' recklessness and/or gross negligence, the ESTATE OF GLORIA J. MICHAUD incurred reasonable expenses occasioned to her estate.

85.     All within the jurisdictional limits of this Court, the Plaintiff's Estate claims damages for the mental and physical pain suffered, the reasonable expenses occasioned to her estate by the injury, the loss of the probable duration of her life but for the injuries, the loss of her capacity to earn money during her probable working life, and all other elements of damages that may be recovered under RSA 556:12.

**SECOND COUNT:  BREACH OF CONTRACT**

86.     Plaintiff realleges each allegation above as if set forth herein.

87.     Plaintiff(s) and Defendant(s) entered into a written contract in which Defendant promised in writing, among other things, that it could and would provide adequate care to Ms. Michaud, including specialized memory care.  Plaintiff even paid extra for "Enhanced Care."

88.     Defendants breached the contract by not providing the services it was contractually obligated to provide.

89.     As a result of the breach of contract Ms. Michaud was damaged as alleged herein.

**THIRD COUNT:  UNFAIR AND DECEPTIVE TRADE PRACTICES**

90.     Plaintiff re-alleges the preceding paragraphs as if fully set forth herein.

91.     By reason of its conduct as alleged herein, Defendant violated the provisions of New Hampshire Consumer Protection Act, RSA 358-A by inducing Plaintiff to become admitted at its facility through the use of false and/or misleading advertising, representations and statements.

92.     The acts and omissions of Defendant alleged herein are uncured or incurable deceptive acts under this statute, which is designed to protect consumers against unfair, deceptive, fraudulent, and unconscionable trade and business practices and false advertising.

93.     Defendant had actual knowledge that it could not provide care to residents through the end of their life as promised.  Defendant also had actual knowledge that it was not providing the specialized memory care and/or services it promised.  Yet, Defendant failed to take any action to cure its misrepresentations.

94.     By engaging in the conduct described herein, Defendants violated the Act by, among other things:

> a.     engaging in unfair or deceptive trade practices as defined in this statute by making false and misleading oral and written statements that had the capacity, tendency, or effect of deceiving or misleading consumers.
>
> b.     engaging in unfair or deceptive trade practices as defined in this statute by making representations that its products had an approval, characteristic, ingredient, use or benefit which they did not have.
>
> c.     engaging in unfair or deceptive trade practices as defined in this statute by failing to state material facts, the omission of which deceived or tended to deceive.
>
> d.     engaging in unfair or deceptive trade practices as defined in this statute through deception, fraud, misrepresentation and knowing concealment,

suppression and omission of material facts with the intent that consumers rely upon the same.

95.    To the extent Defendant's unfair and/or deceptive conduct does not fall within any of the enumerated categories under New Hampshire's Consumer Protection Act, Plaintiffs allege that Defendant's conduct as alleged herein attains a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce.

96.    Defendant's unfair and/or deceptive acts and practices as alleged herein were willful and knowing violations of New Hampshire's Consumer Protection Act.

97.    Plaintiff relied upon Defendants' misrepresentations and omissions in determining which care facility to place Ms. Michaud.

98.    As a direct and proximate result of Defendant's violations of the Act, Plaintiff died and further suffered physical pain and mental anguish, including diminished enjoyment of life, as well as economic hardship, including considerable financial expenses for medical care and treatment.

**WHEREFORE**, Plaintiff seeks the following relief and recovery against all Defendants:

A.    Compensatory damages to Plaintiff for past, present, and future damages, including, but not limited to her death, pain and suffering, loss of enjoyment of life, together with interest and costs as provided by law;

B.    Enhanced compensatory damages;

C.    All ascertainable economic damages, including past and future loss of earnings and/or earning capacity;

D.    Costs, pre-trial interest, and attorneys' fees; and

E.     Such further relief as may be proper and just.

Respectfully submitted,

DARNELE TRIPP AS ADMINISTRATOR
OF THE ESTATE OF GLORIA J.
MICHAUD
By Its Attorneys,

SHAHEEN & GORDON, P. A.

Dated:  November 18, 2021

/s/ Anthony M. Carr
Anthony M. Carr (NH Bar # 267623)
107 Storrs Street
P. O. Box 2703
Concord, NH 03302
(603) 225-7262
acarr@shaheengordon.com